**GLENDALE UNIFIED SCHOOL DISTRICT, Plaintiff,**

v.

**Talar ALMASI; Lena Almasi; State of California; California Department of Education; California Special Education Hearing Office; Mary L. Cote, hearing officer in her official capacity, Defendants.**

**No. CV 00–00017 DDP (BQRx).**

United States District Court, C.D. California.

Dec. 5, 2000.

Karen E. Gilyard, Adam Jason Newman, Aaron V. O'Donnell, Justin Shinnefield, Atkinson, Andelson, Loya, Ruud & Romo, Cherritos, CA, for Plaintiff.

Carol H. Graham, Carol H. Graham Law Offices, Santa Monica, CA, Barry A. Zolotar, Joanne Lowe, Linda A. Cabatic, California Dept. of Education, Sacramento, CA, for Defendants.

## ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PREGERSON, District Judge.

This matter comes before the Court on the plaintiff's and defendants' cross motions for summary judgment. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court adopts the following Order.

## I. INTRODUCTION

The plaintiff in this matter is the Glendale Unified School District (the "District"). On October 8, 1999, an administrative hearing officer rendered a decision against the District and in favor of defendants Talar Almasi ("Talar") and her mother, Lena Almasi ("Lena"). At the time of the hearing, Talar was a five year old student in the District who was eligible for special education services because of a genetic condition associated with delays in all areas of development. The hearing officer decided that for the 1998–1999 academic year: (1) Talar required two hours of individual occupational therapy ("OT") each week; (2) therefore, Lena is entitled to reimbursement for the costs of one hour per week of private OT, including the cost of transportation and parking; (3) the District did not offer Talar a free appropriate public education ("FAPE"); and (4) therefore, Lena is entitled to partial reimbursement for the cost of Talar's enrollment at Discoveryland, a private, parochial preschool.[1]

The parties have filed cross motions for summary judgment. The District requests that this Court overrule the hearing officer's decision on all four issues, while Talar and Lena request that the Court affirm all aspects of the decision.

## II. FACTUAL BACKGROUND

Lena first contacted the District in May 1997 because Talar was approaching the age of three, and the District soon would be responsible for administering Talar's

---

1. The other questions decided by the hearing officer were not briefed by the parties and are not before the Court.

education.[2] At Talar's initial Individualized Educational Program ("IEP") meeting in May 1997, the parties agreed that the District would assess Talar and identify her needs. In June 1997, Lena and the District met to discuss the results of the assessment. The District's assessors determined that Talar was functioning: at the one year old level in speech and language; at the 17 month old level in pre-academics; at the 16 month old level in fine and gross motor areas; at the 26 month old level in social, emotional, and vocational skills; and at the 22 month old level in self-help skills. Lena did not sign the IEP at the June 1997 meeting because she wanted more time to review the IEP goals and objectives. Lena also wanted Talar to undergo a physical therapy ("PT") evaluation before she signed Talar's IEP. Lena informed the District that she would contact the District to complete the IEP after the PT evaluation had been completed. Talar began receiving PT in July 1997 from Ms. Anderson, a physical therapist, at the Center for Developing Kids ("CDK"). Ms. Anderson completed a PT assessment for the District, and the IEP team reconvened on September 2, 1997.

At the September 2 meeting, the District offered Lena multiple choices for Talar's placement: a special day class ("SDC") preschool at one of three sites; or one of two full-inclusion preschool programs, each located at a different site. Lena requested time to consider the placement offers, and agreed to return in three days to sign the IEP. On September 5, 1997, Lena signed the IEP, consenting to Talar's placement in a full-inclusion, six hour a day preschool program at Cerritos Elementary School ("Cerritos"). In addition to the placement at Cerritos, the IEP specified that the District would provide Talar with the following services: individual speech and language therapy two times a week in 30 minute sessions; one weekly session of PT for 60 minutes; direct OT

three times a month in 60 minute sessions; monthly OT consultation in class; and adapted physical education as needed.

The District contracted with CDK for Talar's OT. Ms. Hyde, a registered occupational therapist ("OTR"), began administering Talar's OT through CDK in September 1997.

In December 1997, Lena removed Talar from Cerritos because she felt that Talar was regressing and that the goals and objectives of Talar's IEP were not being met. On December 3, 1997, Lena requested a due process hearing to address Talar's placement.[3] Talar continued to receive OT and PT from CDK, but, starting in December 1997, Ms. McCann, OTR, replaced Ms. Hyde as Talar's occupational therapist.

In March 1998, Ms. McCann recommended to the District that it increase Talar's OT to two times a week. Ms. McCann provided two sessions of OT to Talar for six weeks because Ms. McCann believed that the District and Lena had agreed to this increase in a settlement agreement arising from Talar's due process hearing. However, as of June 3 1998, Lena had not signed the settlement agreement and had not signed a revised IEP. Thus, lacking the authority to continue twice weekly sessions, Ms. McCann reduced Talar's OT to its previous level, one session a week.

On June 3, 1998, an IEP meeting was scheduled to conform Talar's IEP to the terms of a settlement agreement reached between the District and Lena's former attorney regarding the levels of OT, PT, and speech and language services the District would provide for Talar. However, Lena did not attend the June 3 IEP meeting and did not sign the settlement agreement. Lena informed the District that she had retained a new attorney, Ms. Graham,

---

2. Talar previously had received services from the Lanterman Regional Center.

3. Case number SN 1545–97.

and asked the District to contact Ms. Graham to reschedule the meeting.

On October 13, 1998, Lena withdrew her request for a due process hearing. That month, Lena unilaterally decided to enroll Talar at Discoveryland for three mornings a week. Discoveryland is a private preschool for typically-developing children. It is a licensed school, but is not certified to provide special education. Lena did not inform the District of this placement until the November 1998 IEP meeting. (*See* footnote 4 *infra.*)

On October 29, 1998, an IEP meeting was held to develop goals and objectives and determine placement and services for Talar for the 1998–1999 school year. The goals and objectives, however, were not completed on October 29 and the meeting was continued until November 18, 1998. The November 1998 IEP calls for Talar to receive: two 50–minute sessions a week of individual speech and language therapy; one 15 to 30–minute session a week of small-group speech and language therapy; 50 minutes of individual OT a week; two 50–minute sessions of individual PT a week; and reimbursement for the costs Lena incurred transporting Talar to OT, PT, and speech and language therapy. Talar's November IEP lists as "suggestions/offers" placements at: (1) College View; (2) Lincoln SDC; (3) Villa Esperanza; or (4) continued placement at Discoveryland [4] with (a) consultation from Talar's special education teacher, and (b) Lena assuming the cost of that program (because the District had appropriate public placements available).

Lena visited the proposed public placements, but did not believe any was appropriate for Talar. However, on December 9, 1998, Lena consented to implementation of certain portions of the IEP. An addendum to the IEP shows that Lena approved

the speech/language therapy, OT, PT, and the accompanying goals and objectives, but that she did not agree with the OT evaluations.

The one weekly session of OT provided by the District was administered by Ms. An, OTR, at Glendale Adventist Medical Center. Lena believed that Talar needed more OT than the one hour a week provided by the District under Talar's 1998–1999 IEP. Therefore, in February 1999, Lena began paying for an additional weekly session of OT for Talar with Ms. Levine of Children's Hospital Los Angeles.

On March 8, 1999, Ms. Graham requested a due process hearing on behalf of Talar to address Talar's placement and OT services. On March 22, 1999, the District also filed a request for a due process hearing. The matters were consolidated and a hearing was conducted on May 20 and 21, and June 22 and 23, 1999. The hearing was conducted before Ms. Cotes, a Hearing Officer for the California Special Education Hearing Office at McGeorge School of Law, University of the Pacific.

## III. LEGAL STANDARD

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary

---

4. At the November 1998 IEP, the District could not expressly offer placement at Discoveryland because Lena had not disclosed the name of the preschool Talar was then attending. Instead, the IEP states "Assistant with consultation from Special Education Teacher provided to support the current preschool where Talar is enrolled (pending District's ability to observe classroom/school)...." (Defs.' Mtn., Ex. G.)

judgment. *Id.* at 252, 106 S.Ct. 2505. In determining a motion for summary judgment, all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Id.* at 242, 106 S.Ct. 2505. When a mixed question of fact and law involves undisputed underlying facts, summary judgment may be appropriate. *Union Sch. Dist. v. Smith,* 15 F.3d 1519 (9th Cir.1994).

▮ A district court may review administrative decisions issued pursuant to the Individuals with Disabilities Education Act ("IDEA") in the context of a motion for summary judgment. *Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891–92 (9th Cir.1995). The district court conducts a de novo review of the evidence in such cases. *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467 (9th Cir.1993).

**B. IDEA**

A brief explanation of IDEA helps explain the unique process of the de novo judicial review of a special education hearing officer's decision.

IDEA guarantees all disabled children a "free appropriate public education [ ('FAPE') ] that emphasizes special education and related services designed to meet their unique needs...." 20 U.S.C. § 1400(d)(1)(A). IDEA guarantees all students a FAPE, which is defined as special education and related services that: (1) are available to the student at public expense, under public supervision and direction, and without charge; (2) meet the state educational standards; (3) include an appropriate education in the state involved; and (4) conform with the student's IEP. 20 U.S.C. § 1401(8).

An IEP is a written statement for an individual disabled child which is crafted by a team that includes the child's parents and teacher, a representative of the local education agency, and, whenever appropriate, the child. 20 U.S.C. §§ 1401(11), 1414(d)(1)(B). An IEP must contain: (1) information regarding the child's present levels of performance; (2) a statement of annual goals and short-term instructional objectives; (3) a statement of the special educational and related services to be provided to the child; (4) an explanation of the extent to which the child will not participate with non-disabled children in the regular class; and (5) objective criteria for measuring the child's progress. 20 U.S.C. § 1414(d).

In addition to these substantive provisions, IDEA contains numerous procedural safeguards. The local education agency must provide the parents or guardians of a disabled child prior written notice of any proposed change in the identification, evaluation, or educational placement of the child. 20 U.S.C. § 1415(b)(3). The agency also must give parents an opportunity to present complaints regarding any matter related to the education or placement of the child, or the provision of a FAPE to the child. 20 U.S.C. § 1415(b)(6). Upon the presentation of such a complaint, the parent or guardian is entitled to an impartial due process administrative hearing conducted by the state or local educational agency, as determined by state law or by the state educational agency. 20 U.S.C. § 1415(f)(1).

**C. Judicial Review of Administrative Decisions Under IDEA**

Generally, if a party appeals an administrative decision with a district court, to uphold that decision, the court must find that the administrative judge's findings of fact are supported by substantial evidence. *Steadman v. Securities & Exch. Comm'n,* 450 U.S. 91, 99–100, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). Substantial evidence means that more than "a scintilla" of evidence supports the agency decision; if a reasonable person examining the same evidence could have reached the same conclusion, the court must uphold the agency's action. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ However, in reviewing an administrative decision under IDEA, the court's decision must be supported by the preponderance of the evidence. 20 U.S.C. § 1415(i)(2). IDEA provides that "the court ... shall receive the records of the administrative proceedings; ... hear additional evidence at the request of a party; and ... basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.*

■ Although the Ninth Circuit has described the judicial review of the administrative decision as de novo, the standard of review is modified by the special weight given to the hearing officer's decision. *Ojai,* 4 F.3d at 1471; *Doe v. Board of Educ.,* 9 F.3d 455, 458 (6th Cir.1993). A court should not try an IDEA case anew, but rather should give a hearing officer's decision due weight. *Capistrano,* 59 F.3d at 891; *see also Board of Educ. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

> "[D]eference to the hearing officer makes sense in a proceeding under [IDEA] for the same reasons that it makes sense in the review of any other agency action—agency expertise, the decision of the political branches ... to vest the decision initially in an agency, and the costs imposed on all parties of having still another person redecide the matter from scratch."

*Capistrano,* 59 F.3d at 891 (quoting *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1988)).

In *San Diego v. California Special Educ. Hearing Office,* the Ninth Circuit stated:

> [T]he court in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.... Despite their discretion to reject the administrative findings after carefully considering them, however, courts are not permitted simply to ignore the administrative findings.... At bottom, the court itself is free to determine independently how much weight to give the administrative findings in light of the enumerated factors.

93 F.3d 1458, 1466 (9th Cir.1996) (internal citations and quotation marks omitted).

A court should give substantial weight to the hearing officer's decision if the court finds that the decision was careful, impartial, and sensitive to the complexities of the issues presented. *Ojai,* 4 F.3d at 1476. Thus, although the district court independently reviews the evidence and thereafter issues a decision supported by a preponderance of the evidence, the court must give "due weight" to a hearing officer's prior decision.

In this case, the hearing officer, Ms. Cote, issued a lengthy, detailed opinion. She supported her findings with testimony and documentary evidence presented by the parties during the hearing. Ms. Cote's decision was impartial and her reasoning was sensitive to the complexities of the case. Therefore, her decision is entitled to substantial weight.

Further, under IDEA, the parties have the option of presenting the Court with evidence not introduced at the hearing. Neither party has exercised that right in this case. As a result, the Court defers to the hearing officer's decision as to issues of credibility.

## IV. DISCUSSION

### A. Does Talar require two hours of individual occupational therapy each week?

Based on a review of the administrative record and the hearing officer's decision, the Court finds that the hearing officer appropriately determined that Talar required two hours of OT each week during the 1998–1999 academic year. The hear-

ing officer based her decision on: (1) Lena's testimony; (2) the recommendations of registered OTRs Ms. Johnson, Ms. Levine, and Ms. Seligson; and (3) a review of Talar's IEPs and daily treatment records.

### 1. Procedural Objections

### a. Hearsay

First, the District contends that the hearing officer heavily based her decision on the reports of OTRs Ms. Levine and Ms. Seligson. Ms. Levine and Ms. Seligson did not testify at the hearing, and their reports were hearsay. Their assessments were admitted into evidence at the hearing over the District's hearsay objections. The reports of Ms. Levine and Ms. Seligson consisted of the results of tests administered to Talar to measure her level of fine motor, visual motor, and self-help skills. Both Ms. Levine and Ms. Seligson recommended that Talar receive two sessions of OT each week.

The District argues that the hearing officer should have excluded the assessments as inadmissable hearsay in the administrative hearing. Further, the District contends that if the hearing officer had disregarded the hearsay evidence, the weight of the evidence would have shown that Talar did not need two sessions of OT per week.

However, the District does not cite, and the Court is not aware of, any authority to support this argument. The Administrative Procedure Act makes no mention of whether hearsay evidence is admissible at an administrative hearing. *See* 5 U.S.C. § 556(d). The Act states only that *"[a]ny* oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence." *Id.* (emphasis added).

Further, in *Richardson v. Perales,* the Supreme Court interpreted § 556(d), holding that hearsay evidence *is* admissible in administrative hearings. 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

In addition, California law provides that special education hearings shall not be conducted according to the rules of evidence used in court proceedings. 5 Cal.Code Regs. § 3082(b). In particular, § 3082(b) states that "[h]earsay evidence may be used for the purpose of supplementing or explaining other evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." *Id.* As discussed previously, the hearing officer's decision also cites non-hearsay evidence to support her findings. Therefore, the hearsay evidence was admissible for "supplementing or explaining" this additional evidence.

The hearing officer's stated reasons for accepting the hearsay evidence demonstrate that she admitted the evidence knowing that it had limited admissibility. "I looked over the documents that Ms. Gilyard objected to.... I'm just going to go ahead and accept those. They appear to be very relevant."[5] (Hearing Transcript ("HT") 5/21/99 at 3:26–4:4.) In response to Ms. Gilyard's hearsay objection during the June 22, 1999 hearing, the hearing officer explained that Ms. Levine's reports and Ms. Seligson's reports were:

... hearsay. However, that is acceptable in this form and does go to the weight, so we need to accept those. And also, you know, it is at the discretion of the hearing officer whether to accept documents or not. My primary concern in any of these proceedings is to get all the relevant information about the student if I don't know the student and to get all of the relevant information about the programs proposed by the

---

5. Ms. Gilyard objected to the introduction of Ms. Levine's and Ms. Seligson's reports because she did not have an opportunity to cross-examine the authors. At the hearing, Ms. Gilyard admitted that she understood that

hearsay was admissible, but that it only went to the weight of the evidence, and would receive less weight than non-hearsay evidence. (HT 6/22/99 at 4:24–25.)

District since I don't know the District as well. . . .

(HT 6/22/99 at 5:22–6:1.)

The hearsay reports were admissible in the administrative hearing because the reports are relevant and were not the sole basis of the hearing officer's decision. 5 U.S.C. § 556(d); 5 Cal.Admin.Code Regs. § 3082(b).

### b. Improper Rebuttal

Second, the District contends that the hearing officer should not have considered Ms. Johnson's testimony because Lena introduced it after the closing of the defendant's case in chief. Thus, the District argues that this testimony was improper rebuttal evidence.

■ As previously stated, the Rules of Evidence do not apply in administrative hearings; therefore, unless it is unduly repetitious, all relevant testimony should be admitted. 5 U.S.C. § 556(d). The District submitted no authority supporting the exclusion of this evidence from the administrative hearing, and the Court does not find that Ms. Johnson's testimony was unduly repetitious. Therefore, the hearing officer properly considered this testimony.

### 2. Substantive Argument

■ The District argues that, even if it was admissible in the administrative hearing, the hearing officer gave improper weight to the hearsay evidence and rebuttal testimony. The District alleges that the hearing officer "totally ignored" the District's witnesses who testified at the hearing, Ms. McCann and Ms. An. Further, the District alleges that by improperly weighing the evidence, the hearing officer reached the wrong conclusion. An independent review of the evidence—including the hearsay and rebuttal evidence offered by the defendants, Lena's testimony, and the evidence offered by the District—demonstrates that the hearing officer's decision that Talar needs two hours of OT each week is supported by a preponderance of the evidence.

Ms. Johnson was a witness for Lena. She has a Bachelor of Science degree in OT, has completed extensive continuing education and post-graduate work at California State University, Northridge, and has practiced as an OTR for 18 years. On June 11, 1999, Ms. Johnson conducted a two-hour evaluation of Talar at Talar's home. The assessment consisted of observation of and interaction with Talar and conversations with Lena. Through this assessment, Ms. Johnson determined that Talar had extensive needs in the areas of sensory integration, fine motor and visual perceptual activities, and self-help skills.

At the hearing, Ms. Johnson testified that one weekly session of OT would "absolutely not" be sufficient to address Talar's needs. (HT 6/23/99 at 13:8.) Later in her testimony, Ms. Johnson explained that one weekly session is necessary to address Talar's self-help skills, and a second weekly session is necessary to address Talar's sensory integration difficulties. Ms. Johnson stated that ideally Talar should receive three sessions of OT, but if the OT is administered in coordination with other services, specifically PT, two sessions a week might be sufficient. (*Id.* at 12:1–12.) Ms. Johnson emphasized that it was crucial that Talar dedicate at least one OT session a week to working exclusively on self-help skills. (*Id.* at 12:11–12.)

Ms. Johnson also testified that six weeks would not be a reasonable amount of time in which to expect Talar to demonstrate progress resulting from an additional OT session; similarly, Lena testified that a period of six weeks was not long enough for Talar to learn a task, given Talar's developmental levels and her deficits in all major areas of development. Ms. Johnson stated that after Talar is taught a skill, she must practice the skill until she is able to perform it in all environments. Ms. Johnson testified that, when working with children with disabilities like Talar's, it is common to try to achieve short-term goals in

six months, and long-term goals in a year. Further, she testified that with the right goals and objectives, Talar should show progress and attain skills within six months to one year.

Other evidence offered by Lena include the separate reports made by Ms. Seligson in September 1999, and by Ms. Levine in February 1999. Based on a personal evaluation of Talar and a review of OT, PT, and IEP documentation, Ms. Seligson recommended increasing Talar's OT from one to two times a week. Ms. Levine's evaluation, which was based on clinical observations and a parental interview, recommends OT for one to two times per week.

The District contends that the hearing officer "totally ignored" the testimony of its witness, Ms. McCann. At the hearing, Ms. McCann testified about the amount of OT that she believed would benefit Talar.

> Based on her receiving one time a week of intervention that was recommended to increase to two times a week, and then in stated [sic] for a period of two months of time. And then followed by a period of six week no service delivery because of the summer break. That's due to the School District scheduling. I was put in the place of having to determine whether continuation of two times a week or continuation of only one time a week was the best for Talar. And based on her progress, over all those frequencies, I found that her progress was consistently steady and *the rate of progress didn't seem to be effected [sic] by increased frequency.*

(HT 05/21/99 12:1–10 (emphasis added).)

Ms. An, another witness for the District, also testified that Talar would not benefit from an additional session of OT each week. Ms. An provided Talar with OT from December 1998 through March 1999. At the hearing, Ms. An stated that she considered Talar's biggest sensory problem to be gravitational insecurity (knowing where her body is in space), which is why she spent most of her time with Talar working on developing this skill. Ms. An's

testimony at the hearing indicates that during the three to four months she provided Talar with OT, she and Talar never worked on improving Talar's feeding skills. Instead, Ms. An and Talar mainly focused on teaching Talar to put on her shoes and socks.

The District argues that the significant amount of time that Ms. McCann and Ms. An spent assessing Talar's fine motor development and providing her with OT services, between December 1997 and March 1999, as compared to the few hours Ms. Johnson, Ms. Levine, and Ms. Seligson each spent evaluating Talar, dictates that the Court should give significant weight to the testimony of Ms. McCann and Ms. An. The Court generally would be inclined to be particularly deferential to the opinions of a student's treating therapists. However, a review of Talar's IEPs and daily treatment records suggests that, under the circumstances of this case, such deference may not be appropriate.

Talar's IEPs consistently identified self-feeding as a goal and objective. Talar's June 13, 1997 IEP included as a specific short-term goal that Talar will "drink from a regular cup" and "use a spoon to scoop food and feed self". Her next IEP, dated September 2, 1997, included similar goals, and adds that "Talar will attempt to finger feed". The IEP conducted on June 3, 1998 stated the same finger-feeding goal, and added the goal that Talar would "bite off a piece of cracker, chew, and swallow with supervision."

The testimony of Ms. McCann and Ms. An established that they did not consistently address these self-feeding goals during Talar's OT sessions.

Ms. McCann concluded that Talar did not benefit from having a second OT session each week; but this conclusion is undermined by Ms. McCann's October 22, 1998 progress report, which states that Talar's self-feeding goal "has not been consistently worked on" in treatment sessions. Thus, the hearing officer found that Ms.

McCann's conclusion was premature, and that six weeks was not long enough to determine whether the additional OT session was helping Talar meet a specific goal, particularly because that goal was not consistently addressed.

The hearing officer's summary of and comment on Ms. McCann's testimony demonstrates that she did not ignore the testimony of Ms. McCann.

Ms. McCann's testimony confirms that she did not consistently address feeding skills, in particular. She attributed her failure to address Talar's needs in this area or to meet Talar's goals and objectives to the fact that [Lena] did not always bring the necessary food or utensils to the therapy sessions to address feeding.

(Defs.' Mtn., Ex. A, p. 18.) The hearing officer continued:

While it may be desirable to employ utensils similar to those used at home and to use foods Talar likes, Talar's right to receive appropriate services and services called for by her IEP cannot be contingent upon [Lena's] providing materials.

(*Id.*)

The District asserts that it could not work with Talar on her self-feeding goals because Lena did not bring the proper utensils. This argument is not persuasive, because no utensils are needed to "finger feed" or "bite, chew, and swallow" a cracker.

Self-care and feeding were specific goals identified in Talar's IEPs, but the District's own witnesses testified that they did not consistently address these goals with Talar. The hearing officer appropriately found that the failure to consistently work with Talar on self-care and feeding resulted in Talar's poor growth in these areas. There is evidence to support the finding that a child like Talar needs time and repetition to learn a new skill, and that it is inappropriate to abandon a program as useless merely because no measurable improvement is visible after the first six weeks of therapy.

The hearing officer's decision that Talar needed two sessions of OT each week is supported by the preponderance of the evidence. Most persuasive was testimony of Ms. Johnson that a child like Talar who has intensive needs requires at least two sessions of OT each week. Therefore, the Court finds that the hearing officer appropriately concluded that Talar required two hours of OT each week during the 1998–1999 school year.

**B. Is Lena entitled to reimbursement for the costs of Talar's private OT, including transportation and parking?**

Parents may be entitled to reimbursement for the costs of placement or services they have procured for their child when: (1) the school district failed to provide a FAPE; and (2) the private placement or services procured are (a) proper under IDEA and (b) reasonably calculated to provide educational benefit to the child. *Sch. Committee of Burlington v. Dept. of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Student W. v. Puyallup Sch. Dist.*, 31 F.3d 1489, 1496 (9th Cir.1994).

Beginning in February 1999, Lena obtained an additional OT session per week for Talar at Lena's expense. Lena believed that Talar needed this additional session to meet her educational goals. Talar's OT at these additional sessions was administered by Ms. Levine, OTR, of Children's Hospital Los Angeles. As discussed above, Talar required two sessions of OT each week during the 1998–1999 school year, but the District failed to provide Talar with the necessary second weekly session; thus, Talar was denied a FAPE for the 1998–1999 school year.

OT is specifically listed as a "related service" available under IDEA, and therefore is a "proper" service under IDEA. 20 U.S.C. § 1401(22).Thus, if the OT was rea-

sonably calculated to provide educational benefit to Talar, Lena should be reimbursed for the cost of providing that service. *See Burlington,* 471 U.S. at 369, 105 S.Ct. 1996.

Ms. Levine is a qualified OTR. At the hearing, Lena testified that the therapy Ms. Levine provided for Talar was designed to address Talar's dressing and eating deficits. OT administered by a qualified OTR that focused on improving Talar's dressing and eating deficits would provide Talar with some educational benefit. Therefore, the sessions were reasonably calculated to provide educational benefit to Talar.

The hearing officer's determination that Lena should be reimbursed for the costs associated with the additional session of OT during the 1998–1999 school year, including round-trip transportation and parking at the rate which the District reimburses its employees, is supported by the preponderance of the evidence.[6] *See Union,* 15 F.3d at 1527.

### C. Did the District offer Talar a free appropriate public education for the 1998–1999 school year?

■ A placement offer must meet certain substantive and procedural requirements to qualify as a FAPE. *See Ojai,* 4 F.3d at 1469.

#### 1. Substantive Requirements

■ The substantive requirements of IDEA are satisfied when the state provides "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Board of Educ. of Hendrick Hudson Cent. Sch.*

*Dist. v. Rowley,* 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

■ The District claims it offered two educational placements at Talar's November 1998 IEP team meeting: (1) Villa Esperanza, a nonpublic school; and (2) a Preschool SDC (three hours a day at Lincoln Elementary School ("Lincoln"), or at College View), in combination with one to three afternoons a week at a private preschool with typically developing peers, or with opportunities to interact with typically developing peers at Lincoln or College View. The November 1998 IEP, however, clearly lists four choices for Talar under the heading "offers": (1) College View; (2) Lincoln; (3) Villa Esperanza; and (4) remain at current preschool with an assistant and with consultation from a special education teacher, but with Lena assuming the cost of the program since the District contended that it had public options available.

The District contends that Lincoln and College View together constitute one offer because they are both SDCs. The Court disagrees with this argument. The record demonstrates that College View's program was five days a week, six hours a day, while Lincoln's program was only four days a week, three and one-half hours a day. The hearing officer found, and the Court agrees, that the differences in the programs are significant, and therefore they qualify as separate offers. Thus, the IEP made four distinct placement offers, three of which were free and public.[7]

The College View SDC met six hours daily and focused on students developing socialization and life skills. Talar's pediatrician, Dr. Walker, testified that a five-hour program would be detrimental for Talar, given her young age and her multiple disabilities. Therefore, the College

---

6. "The term 'related services' means transportation ... and other supportive services ... as may be required to assist a child with a disability to benefit from special education." 20 U.S.C § 1401(22).

7. The hearing officer's decision indicates that placement in an SDC at Cerritos also was offered. However, a review of the November 1998 IEP shows that while the IEP team discussed this placement, the District did not formally offer this placement.

View school day was too long for Talar. College View also was inappropriate for Talar because the class size was too large and the campus had no regular education students, thereby eliminating the opportunity for mainstreaming. The hearing officer found that College View was an inappropriate placement for Talar, and the Court agrees that this conclusion is supported by a preponderance of the evidence.

Villa Esperanza also was an inappropriate placement for Talar because the class convened five days a week, six hours a day. In addition to the long hours, Villa Esperanza was not available to Talar because campus admission requires that individuals be able to independently exit the facility, and, at the time of the hearing, Talar was not "ambulatory". Therefore, the evidence clearly supports the hearing officer's determination that Villa Esperanza was an inappropriate placement for Talar.

The hearing officer found that Lincoln did represent an appropriate placement for Talar. Lincoln's program met Talar's unique needs, as it offered Talar specialized instruction, a low student-to-teacher ratio allowing one-to-one instruction, and a short school-day of only three and one-half hours. The parties do not contest that the hearing officer correctly determined that Lincoln represented an appropriate placement.

The IEP also offered Talar continued placement at Discoveryland. Because the Discoveryland placement offer was contingent upon Lena incurring its cost, this placement did not constitute a "free" alternative. Therefore, the Court need not assess whether the Discoveryland program represented an appropriate placement for Talar.

The hearing officer concluded that Lincoln was the only free, appropriate placement the District offered, and the Court agrees that this decision was supported by a preponderance of the evidence. Thus, because the District offered Talar a FAPE for the 1998–1999 school year, the District satisfied IDEA's substantive requirements.

## 2. Procedural Requirements

The parties dispute whether the District's offer of multiple placement types rather than a specific, firm recommendation constituted a procedural violation of IDEA, and, if so, whether this procedural violation resulted in a denial of a FAPE for Talar during the 1998–1999 school year.

IDEA sets forth specific procedural safeguards relating to its FAPE guarantee. 20 U.S.C. § 1415(a). A parent's procedural rights include the right to be informed in writing when the educational agency proposes to initiate or change the identification, evaluation, or educational placement of a child; the right to participate in the development of the child's IEP; the right to examine all relevant educational records; and the opportunity for mediation and a due process hearing. 20 U.S.C. § 1415(b).

> Procedural flaws do not automatically require a finding of a denial of a FAPE. However, procedural inadequacies that result in the loss of educational opportunity ... or seriously infringe the parents' opportunity to participate in the IEP formulation process ... clearly result in the denial of a FAPE.

*W.G. v. Bd. of Trustees of Target Range Sch. Dist.*, 960 F.2d 1479, 1484 (9th Cir. 1992) (internal citations omitted).

The Supreme Court has explained the great importance of such procedural components of the IDEA.

> When the elaborate and highly specific procedural safeguards embodied in § 1415 [of the IDEA] are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid.

*Rowley*, 458 U.S. at 205, 102 S.Ct. 3034. In *Union*, the Ninth Circuit held that one

of the procedural violations that may constitute a denial of FAPE is the failure of the District to make a "formal, specific" offer of placement. 15 F.3d at 1526, 15 F.3d 1519. The court found that, "this formal requirement has an important purpose ..., and we ... believe it should be enforced rigorously." *Id.* The court continued:

> The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later..... Furthermore, a formal, specific offer from a school district will greatly assist parents in "present[ing] complaints with respect to any matter relating to the ... educational placement of the child." 20 U.S.C. § 1415(b)(1)(E). For example, in this case, a formal offer ... would have served several purposes. It would have alerted the [parents] to the need to consider seriously whether [the offered placement] was an appropriate placement under the IDEA.... [I]f a formal offer were made, the [parents] could have decided whether to oppose [the offered placement] or to accept it with the supplement of additional education services. Finally, by making a formal offer, the District would have been more prepared to introduce sufficient relevant evidence to the Hearing Officer of the appropriateness of [the offered placement] as a placement for [the student].

*Id.*

■ The District defends its offer of multiple placements under IDEA, contending that offering more than one placement does not constitute a procedural error. The District interprets the *Union* requirement that there be a "formal written offer" of placement to mean that it may offer more than one placement as long as it presents the choices in one coherent written offer. It claims that it satisfied this requirement through the written offers contained in the November 1998 IEP.

In addition, the District argues that even if offering more than one placement

constituted a procedural error, the error did not "result in the loss of educational opportunity ... or seriously infringe the parents' opportunity to participate in the IEP formulation process." *W.G.*, 960 F.2d at 1484.

The hearing officer disagreed with the District's interpretation of *Union* and explained the problems that arise when a district offers more than one placement. "The parent cannot be assumed to have expertise in evaluating educational programs in the brief period of time allotted to observe in each class." (Defs.' Mtn. Ex. A, p. 16.) "The offer must be detailed so as to demonstrate to the parent that the District has carefully thought through and selected a placement that, in its professional judgment, will meet the unique and individual needs of the student." (*Id.* at p. 17.) The hearing officer held that the "District's approach in offering a wide range of diverse placements violated the intent [of] *Union* that a clear, coherent placement offer must be made". (*Id.*)

The Court interprets *Union* to require that the District formally offer a single, specific program. *Union* explains why a specific offer of placement is necessary under IDEA. A specific program offer "alert[s] the [parents] to the need to consider seriously whether [the specific program] was an appropriate placement under the IDEA." *Union*, 15 F.3d at 1526. Offering a variety of placements puts an undue burden on a parent to eliminate potentially inappropriate placements, and makes it more difficult for a parent to decide whether to accept or challenge the school district's offer.

Here, the District offered multiple placement options, each of which included participation in a distinct program. As discussed above, the hearing officer found, and the Court agrees, that only one of the placements offered was appropriate for Talar's unique needs. As the hearing officer concluded, "[t]he parent clearly cannot be required to ferret out from multiple

inappropriate placements the one placement offered by the District that, in fact, could have offered her daughter an appropriate placement. The law simply does not impose such a duty to the parent." (Defs.' Mtn., Ex. A, p. 16.)

The District apparently offered Talar multiple placement options in an effort to accommodate a demanding parent who previously had demonstrated her unhappiness with the options available from the District. However, the District's offer of various types of classrooms, located at a number of different school sites, with varying school-day durations, does not comport with the *Union* requirement that the District make a formal, specific placement offer.

Discussion of a range of possible placements during the IEP meeting is, of course, appropriate. However, a school district cannot abdicate its responsibility to make a specific offer allowing a parent to choose from among several programs presented as formal offers. After discussing the advantages and disadvantages of various programs that might serve the needs of a particular child, the school district must take the final step and clearly identify an appropriate placement from the range of possibilities. It was the District's responsibility to use its expertise to decide which program was best suited for Talar's unique needs. Thus, under *Union*, the District failed to articulate a clear, coherent offer which Lena reasonably could evaluate and decide whether to accept or appeal.

The hearing officer found, and the Court agrees, that the procedural violation did result in the denial of a FAPE for Talar. Because the District failed to make a legally sufficient placement offer, Talar did not receive the special education services required to address her individualized needs during the 1998–1999 academic year. Talar's inability to receive needed special education services resulted in the "loss of an educational opportunity" for Talar. *See W.G.*, 960 F.2d at 1484. Lena participated

in the IEP process. Therefore, the hearing officer determined that the District denied Talar a FAPE for the 1998–1999 school year. This conclusion is supported by a preponderance of the evidence.

**D. Is Lena entitled to reimbursement for the costs of Talar's Discoveryland tuition?**

██ The Supreme Court has held that a court may order a school district to reimburse parents who unilaterally have placed their child in an appropriate private special education program after the school district has failed to offer an appropriate education. *Union*, 15 F.3d at 1527 (citing *Burlington*, 471 U.S. at 359, 105 S.Ct. 1996). "Parents have an equitable right to reimbursement for the cost of providing an appropriate [private] education when a school district has failed to offer a child a [free appropriate public education]." *Id.* at 1523 (internal quotations and citation omitted).

██ The District argues that Discoveryland was an inappropriate setting for Talar because none of the teachers were credentialed or certified as regular or special education teachers. The Ninth Circuit, however, has rejected the argument that a placement is inappropriate only because it is not certified to provide special education. *Union*, 15 F.3d at 1526 (citing *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)) ("[W]hen a parent places a child in a private setting, reimbursement *may* be ordered even though the private institution does not satisfy the state education standards". (emphasis added)).

The director of Discoveryland, Ms. Davis, described Discoveryland's program as "developmental". At the hearing, Ms. Davis testified that she reviewed Talar's IEP and worked with Talar on many of its stated goals and objectives, including those related to play, ambulation, communication, domestic, social, pre-academic and eating skills. Lena and Ms. Davis testified

that Talar made good progress attending Discoveryland; she was beginning to imitate non-disabled children and was attempting to communicate with them.

Although Talar did not receive special educational instruction at Discoveryland, she did participate in mainstreaming and other activities that are appropriate for her mental age. Since Talar was at the "mental age" of approximately two years old, the activities of "painting, coloring, cutting with assistance, and glueing" were appropriate activities that benefitted Talar's education. In addition, Talar was receiving OT and PT from an outside source. The hearing officer determined that Discoveryland adequately addressed Talar's unique needs to the extent possible, and therefore concluded that Discoveryland was an "appropriate private placement" for Talar under *Union.* 15 F.3d at 1527. As a result, the hearing officer held that Lena is entitled to be reimbursed by the District for the cost of sending Talar to Discoveryland during the 1998–1999 school year. Each of these conclusions is supported by a preponderance of the evidence, and therefore Lena is entitled to reimbursement for Talar's Discoveryland tuition.

 The Court must determine whether Lena is entitled to full or partial reimbursement for the expense of enrolling Talar at Discoveryland. Factors to be considered in determining whether full or partial reimbursement is appropriate include: the existence of other more suitable placements;[8] the effort expended by the parent; and the cooperativeness of the school district. *Alamo,* 790 F.2d at 1161. The record contains little information regarding alternative private placements in the area, or the amount of effort expended

by Lena in locating a more suitable alternative placement. Therefore, the only relevant *Alamo* factor the Court may consider is the cooperativeness of the school district, with the added factor of the relative cooperation of the parent. *See W.G.,* 960 F.2d at 1486 (citing *Alamo,* 790 F.2d at 1153). In addition, a court may consider whether the parent's conduct obstructed the District's ability to properly prepare the IEP; if so, a reduction in the parent's reimbursement may be warranted. *Id.* at 1485; *see also Warren G. v. Cumberland County Sch. Dist.,* 190 F.3d 80, 86 (3d Cir.1999).

 The District contends that Lena's conduct was so egregious that the Court should deny her all reimbursement based on equitable considerations. *See Burlington,* 471 U.S. at 359, 105 S.Ct. 1996. Although the District failed to offer a FAPE to Talar, the record shows that the District consistently tried to work with Lena to design an appropriate placement for Talar. The District submitted extensive records of its letters and telephone calls that Lena never returned. In addition, the evidence shows that Lena withheld records relating to Talar that the District needed in its original assessment of Talar, and selectively withheld additional assessments of Talar that could have assisted the District in determining the best program for Talar.[9] Thus, there is evidence that Lena did not cooperate with the District, and that her lack of cooperation may have frustrated the District's attempts to design a program for Talar that complied with IDEA.

However, Lena has a right to be an aggressive advocate for her child. As the court stated in *Rowley,* "parents and guardians will not lack ardor in seeking to ensure that handicapped children receive

---

**8.** The defendant argues that the hearing officer awarded Lena only partial reimbursement because Talar did not receive special education instruction at Discoveryland. This argument misstates the hearing officer's reasoning. The hearing officer's decision to provide only partial reimbursement was based on

Lena's uncooperative conduct—not the inappropriateness of the placement.

**9.** The evidence demonstrates that Lena failed to cooperate in part because she did not like the teachers, the classrooms, the schoolyards, or the OTRs the District offered.

all of the benefits to which they are entitled [under IDEA]." 458 U.S. at 209, 102 S.Ct. 3034. The statutory framework of IDEA emphasizes parental involvement. 20 U.S.C. § 1401 et seq. Congress sought to protect individual children by providing for parental involvement in the development of state plans and policies, and in the formation of the child's individual educational program. *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034 (citing, S.Rep., at 11–12, U.S.Code Cong. & Admin.News 1975, p. 1435). Although the District characterizes Lena's behavior as "uncooperative", it also may be viewed as the "[v]igorous advocacy [that] is an anticipated by-product of a policy encouraging parental involvement." *Warren G.,* 190 F.3d at 86 (citing *Rowley,* 458 U.S. at 209, 102 S.Ct. 3034).

The hearing officer found that "vigorous advocacy" aside, Lena's actions of withholding information from the District impaired the District's ability to make decisions related to Talar's education. Therefore, under the circumstances, the hearing officer decided that it would be unfair to order the District to reimburse Lena fully. As a result, the hearing officer concluded that "neither party's conduct is without fault" and that "the equities weight [sic] in favor of partial reimbursement." (Defs.' Mtn., Ex. A, p. 19.)

The hearing officer's reasoning—that Lena's failure to cooperate justifies a reduction in the reimbursement to which she is entitled—is sound. Therefore, the Court agrees with the hearing officer's determination that Lena is entitled to partial reimbursement for Talar's Discoveryland tuition.

## V. CONCLUSION

For all the aforementioned reasons, the Court upholds the hearing officer's decision that: (1) Talar required two hours of OT each week during the 1998–1999 school year; (2) the District must reimburse Lena for the weekly hour of OT that Talar required and the District failed to provide;

(3) the District denied Talar a FAPE during the 1998–1999 school year; and (4) the District must partially reimburse Lena for Talar's 1998–1999 tuition at Discoveryland.

IT IS SO ORDERED.