**A.K., a minor by his parents and next friends J.K. and E.S.,**
Plaintiff–Appellant,

v.

**ALEXANDRIA CITY SCHOOL BOARD, Defendant–Appellee.**

No. 06–1130.

United States Court of Appeals, Fourth Circuit.

Argued: Nov. 30, 2006.

Decided: April 26, 2007.

---

**ARGUED:** William Bernard Reichhardt, Fairfax, Virginia, for Appellant. John Francis Cafferky, Blankingship & Keith, Fairfax, Virginia, for Appellee. **ON BRIEF:** Colleen C. Sweeney, William B. Reichhardt & Associates, Fairfax, Virginia, for Appellant. Andrea D. Gemignani, Blankingship & Keith, Fairfax, Virginia, for Appellee.

Before WILKINS, Chief Judge, and WILLIAMS and GREGORY, Circuit Judges.

Reversed and remanded by published opinion. Chief Judge WILKINS wrote the majority opinion, in which Judge WILLIAMS joined. Judge GREGORY wrote a dissenting opinion.

## OPINION

WILKINS, Chief Judge:

The parents of A.K., a minor child with disabilities, brought this action on his behalf against the Alexandria City School Board, alleging that Alexandria City Public Schools ("ACPS") violated the Individuals with Disabilities Education Act (IDEA), *see* 20 U.S.C.A. §§ 1400–1487 (West Supp.2006). The parents appeal an order granting summary judgment against them. We reverse and remand for further proceedings.

I.

A.

The IDEA provides every disabled child with the right to a "free appropriate public education" (FAPE) designed to meet his

specialized needs. *Id.* § 1400(d)(1)(A). Congress has defined a FAPE as

special education and related services that ... (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate ... education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

*Id.* § 1401(9).

■] A school provides a FAPE by creating an "individualized education program" ("IEP") for each child. *See id.* § 1414(d)(1)(A); *County Sch. Bd. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 300 (4th Cir. 2005). Before creating the IEP, the school district must conduct an initial evaluation to determine the student's eligibility and to identify his educational needs. *See* 20 U.S.C.A. § 1414(a)(1)(A)-(C). If the child is deemed eligible, an IEP is created by an "IEP Team" comprised of the child's parents, at least one of his regular teachers, at least one of his special education teachers, a school board representative, an individual who can interpret evaluation results (who may be either of the teachers or the school board representative), and, if appropriate, the child himself. *See id.* § 1414(d)(1)(B). The IEP must outline the student's then-current educational status, establish annual goals, and detail the special educational services and other aids that the child will be provided. *See id.* § 1414(d)(1)(A)(i). It also must provide, among other things, "the projected date for the beginning of the services and modifications ..., and the anticipated frequency, location, and duration of those services and modifications." *Id.* § 1414(d)(1)(A)(i)(VII). An IEP is substantively satisfactory if it is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

The IDEA also provides "procedural safeguards to insure the full participation of the parents and proper resolution of substantive disagreements." *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (internal quotation marks omitted). As is relevant here, those safeguards include the right to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C.A. § 1415(b)(6)(A); *see id.* § 1415(f). The IDEA also authorizes a party aggrieved by the state administrative proceeding intended to resolve the complaint to challenge the decision in a federal court action. *See id.* § 1415(i)(2)(A). Such an action is an independent civil action in which the district court considers the state administrative hearing record, as well as any new evidence that the parties offer, and makes findings by a preponderance of the evidence. *See id.* § 1415(i)(2)(C). Although the federal court action is an independent action, the court must give "due weight" to the state administrative proceeding. *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034.

### B.

A.K. was first found eligible to receive special education services under the IDEA at age two and one-half. At that time, A.K. was diagnosed with Semantic Pragmatic Language Disorder with characteristics of nonverbal learning disability. A.K. has since been diagnosed as well with numerous other disorders, including Aspergers Syndrome and obsessive compulsive disorder. A.K. was educated in the ACPS school system through the seventh grade

until he began to be teased and assaulted by other students to an extent that he no longer felt safe. A.K.'s parents ("the parents") subsequently searched unsuccessfully for a private day school in the Washington, D.C. metropolitan area that could meet their son's specialized needs.

For the 2003–04 school year, when A.K. was in the eighth grade, the parents enrolled A.K. in the Riverview School, a residential school in Massachusetts, pursuant to a settlement between the parents and ACPS. ACPS had proposed local private day school but agreed to fund the portion of Riverview tuition that was equivalent to private day school placement. The parents were very happy with A.K.'s progress at Riverview.

In preparation for the 2004–05 school year, A.K.'s IEP team, which included ACPS personnel, Riverview personnel, and the parents, met on May 21 and 28, 2004, and June 9, 2004 for a total of eight to ten hours. Until the last half hour of the final meeting, the team spent its time defining A.K.'s level of performance and setting goals and objectives for the upcoming year. With only a few minutes of discussion regarding placement, ACPS announced that A.K. should be placed at an unspecified private day school.[1] Unaware of any private day school in the area equipped to meet A.K.'s specialized needs, the parents asked ACPS representatives which private day school he could attend.

Susan Sullivan, ACPS's private placement specialist and the IEP team chairperson, suggested the Kellar School and the Phillips School as possibilities. A.K.'s mother responded that she did not believe either of those schools would be appropriate. The meeting closed without any significant discussion about the appropriateness of Kellar or Phillips or any other possible private day schools.

The resulting IEP contained a detailed discussion of A.K.'s then-current level of performance. It also set forth goals and objectives, along with a plan to aid A.K. in the transition from Riverview to a private day school. However, it did not identify any particular school but simply listed A.K.'s placement as "Level II—Private Day School placement." J.A. 379. Based on their objection to that placement, the parents refused to sign the IEP.[2]

In July 2004, ACPS sent out applications on A.K.'s behalf to five area private day schools: The Lab School, The Ivymount School, Oakmont School, Phillips, and Kellar. Based on the applications provided, The Lab School and Oakmont (and perhaps Ivymount) determined that they could not provide A.K. a FAPE due to the complexity of his disabilities.[3] However, Phillips and Kellar both indicated that they believed, based on the information they had received, that they had an appropriate program for A.K., and invited him and his parents to visit the school.

1. The district court found that "[p]rivate day school placement is a term of art describing an educational program which includes several characteristics such as a small overall student body size, small classes, small facility, extensive clinical support, the ability to work individually with a student, extensive behavioral management, and parental involvement." *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 409 F.Supp.2d 689, 693 (E.D.Va. 2005).

2. On July 2, the parents signed the IEP only as it related to the extended school year (ESY) services to be provided for A.K. in the summer of 2004 but continued to refuse to accept the plan with regard to the 2004–05 school year.

3. An Ivymount representative informed Sullivan that the school did not have space available for A.K. A.K.'s mother testified, however, that the same representative also told her that Ivymount's program would not have been appropriate for A.K. in any event.

A.K.'s mother toured both schools in July,[4] and, after consulting with some experts who were familiar with A.K., determined that neither school would be able to meet A.K.'s specialized needs. Having been unable to find any local private day school that they believed could provide A.K. with a FAPE, the parents, on July 9, 2004, requested an administrative special education due process hearing to determine whether ACPS had offered A.K. a FAPE. ACPS sent a letter to the parents in early August informing them that Phillips and Kellar wanted to schedule interviews with A.K., but the parents, having determined that those schools could not serve A.K.'s needs, did not seek to schedule such interviews.

At the due process hearing, the parents did not challenge the notion that a private day school could theoretically meet A.K.'s needs, but they argued that the IEP failed to identify a particular school in the area that could do so and that they had not been able to find one.[5] Thus, the parents sought reimbursement for their Riverview tuition on the ground that ACPS had failed to offer A.K. a FAPE and Riverview provided an appropriate education.

Both sides presented testimony regarding whether Phillips, Kellar, or Riverview was appropriate for A.K.'s individual needs. ACPS's testimony established that the Phillips School provides individualized educational programs implemented by classroom staff. It also offers small group instruction, one-on-one intervention, speech and language development, and training in social and daily-living skills.

The majority of students at Phillips are 14–18 years old, and they have a wide range of disabilities. Students with similar needs are generally grouped together in particular classrooms. Phillips utilizes a progressive level system, in which students are given more freedom and responsibility as their behavior and academic motivation improve. Laura Heyer, a program supervisor at Phillips who had previously taught at the school for 10 years, testified that she did not know of any reason why Phillips could not provide an appropriate program for A.K. Susan Sullivan expressed the same opinion.

Testimony showed that the Kellar School is a smaller school for middle and high school students. At Kellar, the students work in teams with a counselor in each classroom to help the students. Like Phillips, Kellar employs a level system, under which students gain independence as their work habits, academic work, and behavior improve. Sullivan testified that she believed Kellar would have been able to provide A.K. with a beneficial education.

The parents, on the other hand, presented testimony from two experts that neither Phillips nor Kellar could meet A.K.'s specialized needs. They first presented the testimony of Cheryl Weitz, a licensed social worker in the practice of child psychotherapy who frequently works in IEP development. She testified that many of the students at Phillips were aggressive, disruptive, and occasionally violent. She testified that she would expect that A.K., if placed at Phillips, would "regress into that

---

4. She had toured both previously in her attempts to find an appropriate local private day school for A.K.

5. The parents also challenged the adequacy of the services described in the IEP, contending that A.K. needed more than one hour of private counseling per week, that needed transition services were not adequately specified,

and that certain supplemental services were not properly described. The parents further argued that ESY services included in the IEP for July 1, 2004 to August 1, 2004 were never provided. These claims were also raised before the district court; however, they are not germane to this appeal.

fearful, anxious state where he would be more shutdown in self-protection." J.A. 921. She also opined that Phillips' focus on eliminating problems in behavior and motivating students to try to learn would cause A.K., who did not have significant behavior or motivation problems, to regress cognitively. She expressed similar concerns about Kellar based on her view that Kellar educated many children with psychiatric problems who often are violent and attend the school for only a short period. She stated that although she believed A.K. could benefit educationally from a private day school "if the structure were appropriate," she did not believe that either Kellar or Phillips "would be appropriate" considering A.K.'s needs. *Id.* at 923–24.[6]

Dr. William Stixrud, a neuropsychologist in private practice, expressed similar reservations about A.K.'s prospects in schools having a significant number of students with psychiatric and behavior problems. Dr. Stixrud opined that such a setting would be "counter-productive in terms of [A.K.'s] availability for learning and his ability to benefit from education that focuses on academics or adaptive behavior." *Id.* at 1006. Like Weitz, Dr. Stixrud did not testify that no private day school could meet A.K.'s needs. Rather, he testified that A.K.'s multiple disabilities overlapped, providing a complex set of challenges requiring a very specific type of learning environment in order for A.K. to make academic progress. He testified that he was not aware of any private day school geographically accessible to A.K. that could meet A.K.'s specialized needs.

The hearing officer denied the parents' claim. He concluded that ACPS did offer A.K. a FAPE by offering him education at "private day school." Although the hearing officer did not specifically resolve the parents' contentions that Phillips and Kellar could not offer A.K. a FAPE, he did discuss ACPS's failure to identify a particular school that could meet A.K.'s specialized needs:

> The fact that ACPS did not specify a particular private day program suggests to me that ACPS wanted to give the parents as much flexibility as possible on this issue. Several private day possibilities were suggested, and the parents [were] given the option of choosing the one which was most attractive to them. The fact that they found none of the possibilities attractive does not mean that the ACPS approach was not in accordance with the FAPE mandates. Thus I conclude that private day placement does provide FAPE.

*Id.* at 1305.

Dissatisfied with this result, the parents brought the present civil action in federal district court, again seeking reimbursement for their Riverview tuition. They alleged not only that the IEP failed to offer a FAPE, but also, as is relevant here, that ACPS had failed to notify the parents before the IEP meetings that private day placements in their area would be considered. The district court granted summary judgment against the parents. *See A.K. ex rel. J.K. v. Alexandria City Sch. Bd.,* 409 F.Supp.2d 689 (E.D.Va.2005). On the notification question, the district court ruled that the parents were on notice that private day schools in their area would be considered because ACPS had recommended private day school placement for the 2003–04 school year. *See id.* at 693. With regard to substantive compliance, the district court concluded that ACPS's mentioning of Kellar and Phillips during the

---

6. On the issue of placement with violent students, Sullivan testified that she believed Phillips would be able to group students to accommodate their varying needs.

final IEP meeting constituted a "placement offer" of those two schools. *Id.* at 694. Citing the testimony of the ACPS officials that the offer was appropriate, the district court found that ACPS offered A.K. a FAPE. *See id.* at 694–95.

## II.

The parents argue that the district court erred in determining that the school district complied with the substantive components of the IDEA. In particular, they maintain that ACPS failed to offer a FAPE because its IEP did not identify a particular school at which it anticipated that A.K. would be educated.[7] We agree.

"When a state receiving IDEA funding fails to provide a FAPE, the child's parent may remove the child to a private school and then seek tuition reimbursement from the state." *A.B. ex rel.*

*D.B. v. Lawson*, 354 F.3d 315, 320 (4th Cir.2004). "The parent may recover if (1) the proposed IEP was inadequate to offer the child a FAPE and (2) the private education services obtained by the parents were appropriate to the child's needs." *Id.*

The parents bore the burden here of proving that the IEP was substantively deficient. *See Spielberg ex rel. Spielberg v. Henrico County Pub. Sch.*, 853 F.2d 256, 258 n. 2 (4th Cir.1988) (assigning burden to party challenging the hearing officer's decision); *cf. Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 537, 163 L.Ed.2d 387 (2005) (holding that party challenging IEP in due process hearing bears burden of proof). A determination that an IEP is sufficient is a factual finding that we review for clear error.[8] *See Z.P.*, 399 F.3d at 309 & n. 7. However, such a finding is not entitled to

---

7. The parents actually characterize this as both a procedural and a substantive violation of the IDEA. However, because we view this claim as an alleged deficiency in what ACPS was offering rather than in the procedure by which the offer was developed or conveyed, we consider the alleged violation to be substantive. *See Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 767–70 (6th Cir.2001) (considering the question of whether the IEP offered an appropriate program to be substantive). *But cf. MM ex rel. DM v. Sch. Dist.*, 303 F.3d 523, 533–35 (4th Cir. 2002) (holding that failure of the school district to finalize an IEP prior to the beginning of the school year was a procedural defect). The dissent appears to assert that the failure of the IEP to identify a particular school was a procedural violation subject to harmlessness analysis rather than a substantive violation because the parents would have sent A.K. to Riverview no matter what ACPS offered. *See post*, at 684–86. This argument conflates the question of whether a violation is merely procedural—and thus subject to harmlessness analysis—with the harmlessness analysis itself. Under the dissent's logic, even a complete failure by a school district to offer—formally or informally—any alternative to the parents' favored educational plan would

amount only to a harmless procedural error if the district could establish that the parents would not have been receptive to the district's offer.

The parents also contend that the district court erred in granting judgment against them because ACPS failed to meet the procedural requirements of the IDEA. In particular, they argue that ACPS failed to provide them with a description of the proposed change—from Riverview to a private day school—prior to the IEP meetings. Regardless of whether the district court addressed this issue, because the issue was apparently never raised to the hearing officer, we do not address it. *See David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 424 (1st Cir.1985) ("[F]or issues to be preserved for judicial review they must first be presented to the administrative hearing officer."). In any event, in light of our holding that A.K.'s IEP was not reasonably calculated to enable A.K. to receive educational benefits, the notice issue is not material to our decision.

8. That the order on review here is nominally one for summary judgment does not preclude our application of the clear error standard to what are essentially factual findings following a bench trial. *See Z.P.*, 399 F.3d at 309 n. 7.

deference to the extent that it is based upon application of an incorrect legal standard. *See id.* at 309.

The IDEA provides that an IEP must state "the projected date for the beginning of the services and modifications ..., and the anticipated frequency, *location,* and duration of those services and modifications." 20 U.S.C.A. § 1414(d)(1)(A)(i)(VII) (emphasis added). The Senate Report concerning the 1997 amendments to the IDEA, which added the requirement that the location be identified, noted that the new requirement reflects the fact that the location "influences decisions about the nature and amount of these services and when they should be provided." S.Rep. No. 105–17, at 21 (1997), U.S.Code Cong. & Admin.News 1997, 78, 99. Indeed, we have previously discussed the potential importance of the particular location at which special educational services are provided. *See AW ex rel. Wilson v. Fairfax County Sch. Bd.,* 372 F.3d 674 (4th Cir.2004). In *AW,* the student alleged that the school district's transfer of him to a different classroom within the same school because of a pattern of misbehavior violated the "stay-put" provision of the IDEA, which requires that a student's "educational placement" not change while disciplinary proceedings are pending. *See* 20 U.S.C.A. § 1415(j); *AW,* 372 F.3d at 676, 678. We concluded that there was "little support in the IDEA's underlying principles for [the] assertion that 'educational placement' should be construed to secure [the] right to attend school in a particular classroom at a particular location." *AW,* 372 F.3d at 681. We held "that the term 'educational placement' as used in the stay-put provision refers to the overall educational environment rather than the precise location in which the disabled student is educated." *Id.* at 676. We nevertheless observed that a change in the location at which special education services are provided causes a change in "educational placement" if the location change "results in a dilution of the quality of a student's education or a departure from the student's [least restrictive environment]-compliant setting." *Id.* at 682.

In light of the fact that the school at which special education services are expected to be provided can determine the appropriateness of an education plan, it stands to reason that it can be a critical element for the IEP to address. *See* Paolo Annino, *The 1997 Amendments to the IDEA: Improving the Quality of Special Education for Children with Disabilities,* 23 Mental & Physical Disability L. Rep. 125, 126 (Jan./Feb.1999) (noting that requirement that IEP identify location at which special education is expected to be provided reflects the fact that "[a]ll schools and classes are not uniform"). *But see White ex rel. White v. Ascension Parish Sch. Bd.,* 343 F.3d 373, 379 (5th Cir.2003) (holding that "[t]he provision that requires the IEP to specify the location is primarily administrative"). The identification of a particular school in the IEP indicates to the parents that the school district has carefully considered and selected a school that will meet the unique needs of the student. *See Glendale Unified Sch. Dist. v. Almasi,* 122 F.Supp.2d 1093, 1107 (C.D.Cal.2000). Conversely, an offer that fails to identify the school at which special educational services are expected to be provided may not be sufficiently specific for the parents to effectively evaluate. *See Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1526 (9th Cir.1994) (explaining that despite district's contentions that its school for autistic children would have been an appropriate placement for the child, district did not offer that school when it did not make a formal, written offer to provide the child services at that school); *Knable ex*

*rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir.2001) (similar).

Here, we hold as a matter of law that because it failed to identify a particular school, the IEP was not reasonably calculated to enable A.K. to receive educational benefits. *See Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. Indeed, this case presents an excellent example of the circumstances under which inclusion of a particular school in an IEP can be determinative of whether a FAPE has been offered. The parents agree that an *appropriate* private day school could provide a FAPE; they favor keeping A.K. at Riverview only because they have not found a private day school in their area that could meet A.K.'s specialized needs. Yet, the IEP development process concluded without any significant discussion of whether such a school existed, or if it did, how it would be a satisfactory match for A.K. Although Sullivan mentioned during an IEP meeting that Kellar and Phillips would be possible placements, the IEP team had never considered whether these particular schools would be able to satisfy A.K.'s specialized needs. Indeed, IEP team member Jill Cohen, an ACPS autism resource specialist, acknowledged at the due process hearing that when she signed the IEP recommending private day school she had no knowledge of any specific private day schools being considered.

That ACPS proceeded to submit applications on A.K.'s behalf to five different private day schools, at least two of which indicated, without even meeting A.K., that they could not satisfy his specialized needs, only highlights the need for the IEP team and the IEP to identify a particular school. With the IEP not identifying any particular school (because the IEP team had not discussed the issue), the parents were left to fend for themselves to determine whether any private day school in their area—including the five ACPS applied to—would be a satisfactory fit. This is not how the IDEA was designed to work. *See Glendale*, 122 F.Supp.2d at 1107 (noting that a failure to identify a particular school places "an undue burden on a parent to eliminate potentially inappropriate placements, and makes it more difficult for a parent to decide whether to accept or challenge the school district's offer").[9] Rather, "[a]fter discussing the advantages and disadvantages of various programs that might serve the needs of a particular child," it is incumbent on the school district to utilize its expertise to "clearly identify an appropriate placement from the range of possibilities."[10] *Id.* at 1108.

In finding that ACPS offered A.K. a FAPE, the district court erroneously relied on the premise that "ACPS made a placement offer both at the Phillips School

---

**9.** We note that in *MM,* the school district had agreed to provide special education services at either of two different schools and we nonetheless held that the district had offered a FAPE. *See MM,* 303 F.3d at 535. The opinion there, however, provides no indication that the parents objected to the particular schools at issue or argued that the school district should have identified a single school. *See id.*

**10.** That is not to say that a change in the school where services were to be provided would constitute a change in placement.

Rather, a change in school constitutes a change in placement only if the change "result[ed] in a dilution of the quality of [the] student's education or a departure from the student's LRE-compliant setting." *AW,* 372 F.3d at 682.

We emphasize that the IEP-development process is a cooperative one. Thus, if the school district identifies several schools during that process that it believes would serve the needs of the child, parents will have the opportunity to voice their preference before the IEP is finalized.

and the Kellar School." *A.K.*, 409 F.Supp.2d at 694. In evaluating whether a school district offered a FAPE, a court generally must limit its consideration to the terms of the IEP itself. *See Z.P.*, 399 F.3d at 306 n. 5; *Knable*, 238 F.3d at 768. *But cf. MM ex rel. DM v. Sch. Dist.*, 303 F.3d 523, 535 (4th Cir.2002) (evaluating proposed IEP when parents' lack of cooperation prevented IEP team from finalizing the IEP). Expanding the scope of a district's offer to include a comment made during the IEP development process would undermine the important policies served by the requirement of a formal written offer, namely, "creating a clear record of the educational placement and other services offered to the parents" and "assist[ing] parents in presenting complaints with respect to any matter relating to the educational placement of the child." *Knable*, 238 F.3d at 768 (internal quotation marks & alteration omitted). Especially in this case, in which the parents had tried in vain to find a local private day school that could meet A.K.'s specialized needs, the offer of an unspecified "private day school" was essentially no offer at all.[11]

We emphasize that we do not hold today that a school district could never offer a FAPE without identifying a particular location at which the special education services are expected to be provided. There is no reason for us to frame the issue so broadly.[12] But, certainly in a case in which the parents express doubt concerning the existence of a particular school that can satisfactorily provide the level of services that the IEP describes, the IEP must identify such a school to offer a FAPE.

Our determination that the school district failed to offer a FAPE does not resolve the parents' reimbursement claim, however. The claim remains unresolved because the district court has not made findings regarding the appropriateness of A.K.'s placement at Riverview. *See Z.P.*, 399 F.3d at 311. Thus, we remand to the district court for further proceedings consistent with this decision. *See id.*

### III.

In sum, we reverse the grant of summary judgment against the parents and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

GREGORY, Circuit Judge, dissenting:

Today the majority mistakenly concludes that an inconsequential procedural error denied a disabled student of the opportunity for a FAPE. Of equal concern, the majority blurs the already indistinct line between procedural and substantive errors in the preparation of IEPs, documents that are of singular importance to the proper operation of the IDEA. The IEP that ACPS prepared for A.K. was flawed—it did not include the location at which A.K. would receive special educational services—but the flaw was merely

---

11. For this reason, the dissent's contention that despite the fact that no location was included in the IEP, the parents knew "with a reasonable degree of certainty" where ACPS proposed to educate A.K. is not dispositive. *Post*, at 684–85. The contention is also factually suspect considering that although Sullivan mentioned that Kellar and Phillips would be possibilities for A.K., she never indicated that the district would not consider other schools as well (as it did when it sent applications to three other schools).

12. The dissent's characterization notwithstanding, we do not "acknowledge[ ] that the failure to identify the location of the provision of special education services on a student's IEP need not always result in the denial of a FAPE." *Post*, at 684. We merely note that we need not decide that issue today.

procedural and did not deny A.K. a FAPE. Because I believe the school district's error was harmless, I respectfully dissent.

## I.

In cases in which a student claims he was denied a FAPE, we first inquire into whether the school district complied with the procedural requirements of the IDEA. *See Bd. of Educ. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Even if ACPS violated one or more of the IDEA's procedural requirements, A.K. may have received an acceptable opportunity for a FAPE. *See DiBuo v. Bd. of Educ.,* 309 F.3d 184, 190 (4th Cir.2002) (ruling that a procedural violation of the IDEA cannot deny a disabled child a FAPE when the violation does not interfere with the provision of a FAPE to that child); *Burke County Bd. of Educ. v. Denton,* 895 F.2d 973, 982 (4th Cir.1990). If A.K. did not lose an educational opportunity as a result of the procedural error, he was not denied a FAPE. *See DiBuo,* 309 F.3d at 190.

The majority is correct that A.K.'s IEP did not meet the IDEA's requirements. Specifically, the IEP did not specify the anticipated location at which the school district would provide special education services to A.K. The IDEA requires that an IEP include "the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications...." 20 U.S.C. § 1414(d)(1)(A)(i)(VII) (Supp.2004). The statute does not define *location* as it is used in § 1414(d)(1)(A)(i)(VII), but the term must refer to something other than an educational placement, something more akin to a particular geographic locale.

Section 1414(d)(1)(A)(i)(VII) concerns itself with some of the logistical considerations parents might have when making a decision regarding their · child's education. The projected starting date, frequency, location, and duration of the child's educational sessions are relevant to practical concerns like scheduling the child's day and arranging for the child's transportation. *See White v. Ascension Parish Sch. Bd.,* 343 F.3d 373, 379 (5th Cir.2003) ("The provision that requires the IEP to specify the location is primarily administrative....").

This understanding of *location* is consistent with our precedent. When defining *educational placement* as it is used in the IDEA's "stay put" provision, we repeatedly distinguished *educational placement* from *location. See A.W. v. Fairfax County Sch. Bd.,* 372 F.3d 674, 681–83 (4th Cir.2004). Concluding that *educational placement* referred to an "instructional setting," this Court emphasized that the placement did not refer to the "precise location of that setting" or the "precise physical location where the disabled student is educated." *Id.* at 683, 681. As it is used in the IDEA (and in common parlance), then, *location* refers to something geographic in nature: a place or locale. This understanding is consistent with the notion that § 1414(d)(1)(A)(i)(VII) deals with practical, logistical considerations.

A.K.'s 2004–2005 IEP contains a chart with a column labeled "LOCATION OF SERVICES." That column bears the solitary entry "SpeEd [illegible]," in reference to the type of education A.K. would receive, not the location at which he would receive it. Thus, A.K.'s IEP was flawed.[1] ACPS's error, however, was only procedural.

---

1. I note that in IEPs developed for A.K. in previous years, the "LOCATION OF SERVICES" column contained such entries as "Special Edu," "General Edu," "Consult," and "regular." These descriptions, whatever their value, do not satisfy the IDEA's requirement that the school district list the anticipated location of services in the IEP. They did,

There is no bright line distinguishing all the "procedural" requirements of the IDEA from its "substantive" requirements.[2] If such a line could be drawn, it might be done by looking to the consequences of the violation of the IDEA requirement in question. The violation of a substantive requirement results, of necessity, in the denial of a FAPE, whereas the violation of a procedural requirement does not, see DiBuo, 309 F.3d at 190. More than once the majority acknowledges that the failure to identify the location of the provision of special education services on a student's IEP need not always result in the denial of a FAPE. See ante 681, 682. This concession supports the conclusion that the requirement that a school district give an anticipated location on the IEP is only procedural. But then the majority states without explanation that it "views [A.K.'s] claim as an alleged deficiency in what ACPS was offering rather than in the procedure by which the offer was developed or conveyed" and therefore considers the ACPS's violation to be substantive. Ante 679 n. 7. It is not. ACPS erred, but that error was procedural.

## II.

ACPS's error did not deny A.K. a FAPE. In DiBuo, this Court asked "[w]hether a procedural violation of the IDEA can support a finding that a school district failed to provide a disabled child with a FAPE when the procedural violation did not actually interfere with the provision of a FAPE to that child." 309 F.3d at 190. The answer to the question, we said, is no. Id. DiBuo and the cases it cites make clear that something more than a simple procedural violation must exist in order for an aggrieved student to prevail in this sort of appeal: the violation must result in some loss of educational benefit or opportunity and cannot simply be a harmless error. See id. Here A.K. lost no educational opportunity and therefore was not denied a FAPE.

As the district court pointed out, ACPS recommended both the Phillips and Kellar schools as options for A.K. during the June 9 IEP meeting. A.K. ex rel. J.K. v. Alexandria City Sch. Bd., 409 F.Supp.2d 689, 693 (E.D.Va.2005). Whether or not there was extensive discussion of the schools during the meeting, Susan Sullivan named the schools as possible locations at which A.K. might be educated. In A.K.'s case, this oral notice was equivalent to the written notice the IDEA requires: after Sullivan's suggestions were made, A.K.'s parents knew with a reasonable degree of

---

however, satisfy A.K.'s parents: A.K.'s mother signed IEPs that did not specify location for both the 2002–2003 and 2003–2004 school years without objection on this point.

A.K.'s mother signed the 2003–2004 IEP as part of a settlement agreement between the parents and ACPS. Under the terms of the agreement, the parents consented to the "private day school placement" designated in the IEP in exchange for ACPS's partial funding of A.K.'s education at Riverview that year. Then, as now, the parents' true complaint was that A.K. should be at Riverview and not in private day placement at all. Unfortunately, ACPS refused to subsidize A.K.'s Riverview education for the 2004–2005 school year and

presented ample evidence during the 2004 due process hearing to justify its choice of private day placement for A.K. To obtain funding for their preferred school a second time, the parents are left with a claim that a procedural oversight denied A.K. some educational opportunity.

2. Although 20 U.S.C. § 1415 addresses itself specifically to procedural safeguards, we have found several of the requirements listed in § 1414 to be procedural as well. See, e.g., DiBuo, 309 F.3d at 187, 190–92; MM ex rel. DM v. Sch. Dist., 303 F.3d 523, 535 (4th Cir.2002).

certainty where ACPS proposed to educate their child the following school year. The Phillips and Kellar schools were the only ones named as possibilities by ACPS until the school district sent A.K.'s information to several other private day schools on July 6, and during the IEP meeting, A.K.'s parents understood them as such.

The majority discounts the mention of these two schools because, it says, the IEP team had never considered whether those particular schools would be able to satisfy A.K.'s needs. *See ante* 681–82. This objection has no bearing on the question whether ACPS's failure to specify a location on the IEP harmed A.K. The majority's principal concern is that A.K.'s parents had no idea where their child was likely to receive special education services, placing upon them the "undue burden" of investigating any number of potential placements. *See ante* at 681. But A.K.'s parents did know where he would likely receive special education services: the Phillips School or the Kellar School.

Even if the decision-making process was relevant to the question of notice, there was no defect in the manner in which ACPS selected the Phillips and Kellar schools as possibilities. Sullivan, who suggested the schools at the June 9 meeting, was ACPS's private placement specialist and had nearly thirty years of experience in the special education field. It was her job to place needy students in private day or residential schools. She visited schools (including Phillips and Kellar) and worked with teachers and parents to ensure successful placements. She knew A.K.'s case well and had placed other students in both the Phillips and Kellar schools before. Her recommendations for A.K. were of precisely the sort it was her job to make. The IDEA does not govern the process by which she must arrive at her recommendations, and I find no problem with either her reliance upon her expertise or her ultimate suggestions. *Cf.* § 1414(d)(3)(B) (listing factors IEP team must consider while developing IEP).

The IDEA does not require that an IEP identify the definitive location for the provision of a child's special education services; the IEP need only supply the anticipated location. § 1414(d)(1)(A)(i)(VII). In A.K.'s case, the IEP did not, but ACPS suggested two potential locations during the June 9 meeting.[3] If A.K.'s parents wished to challenge the suitability of either school, they could have done so (and did), but the basis for their complaint ought not to have been that they were unaware of the anticipated location of services. Because A.K.'s parents were given notice that the Phillips and Kellar schools were locations under consideration; ACPS's failure to write this information on his IEP did not deny A.K. of an educational opportunity.

---

**3.** As the majority acknowledges, *see ante* 681 n. 9, this Court has upheld the validity of an IEP in which a school district promised to provide special education services at one of two different locations, *see MM,* 303 F.3d at 529, 535. Although the number of schools suggested on the IEP was not at issue in that case, *MM* lends support to the proposition that a school district may suggest more than one school and still satisfy its obligation to write the anticipated location of the provision of services on an IEP. A multiplicity of suggested locations may well place an "undue burden" on the parents (as might suggesting no school at all), but two schools hardly constitute a multiplicity. I am troubled that the majority is willing to punish a school district for acknowledging that more than one school may appropriately serve a child's needs. Given that neither of the two suggested schools had met with A.K. personally (as each needed to do before finally determining whether it could adequately serve him), it would serve no purpose to force ACPS arbitrarily to suggest one over the other in the IEP.

Perhaps more important than the notice provided in the June 9 IEP meeting is the apparent determination of A.K.'s parents to keep him at Riverview no matter the outcome of the IEP proceedings. *See MM ex rel. DM v. Sch. Dist.*, 303 F.3d 523, 535 (4th Cir.2002) (finding procedural error harmless in part because there was no evidence parents would have accepted FAPE offered by school district). Before the 2004–2005 IEP development process even began, A.K.'s parents signed a contract and paid a deposit for A.K. to return to Riverview for the summer of 2004 and the 2004–2005 school year.[4] A.K.'s mother testified that she was unwilling to bring A.K. back from Riverview, where he was attending a summer program, without a "specific placement" in Alexandria being identified first. Apparently this unwillingness extended even to trips home that might help identify that "specific placement": both Phillips and Kellar requested interviews with A.K. during the summer in order to determine conclusively whether they could give him the assistance he required, but A.K.'s parents never brought him home to attend those interviews. A.K.'s mother testified that when the Phillips and Kellar schools were named as potential locations in the June 9 IEP meeting, she already had determined that both schools were inappropriate for her son. She understood those schools were suggested locations; she simply disagreed with their selection. It is difficult to understand how A.K. could have lost educational opportunity on account of the omission of the schools' names from his IEP when his parents understood both schools were under consideration and had already expressed that neither was appropriate for their son.

Finally, the Hearing Officer's decision indicates that the parents had no objections to the notice the IEP provided at the time of A.K.'s due process hearing. Any procedural violations pertaining to the IEP's notice function, then, were considered harmless by the parents (or at least, harmless enough that the parents chose not to raise the issue before the Hearing Officer). In short, A.K. was denied no educational opportunity as a result of ACPS's failure to list an anticipated location for his education on his 2004–2005 IEP. Without a denial of an educational opportunity, A.K. could not have been denied a FAPE by the error. *See DiBuo*, 309 F.3d at 190.

## III.

The second component of the reviewing court's inquiry regards substantive compliance with the IDEA. It is intended to ensure that the IEP developed is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. In this case, the Hearing Officer found that private day placement would "assist A.K. in his transition into the local community, and constitute the least restrictive environment for him." A residential program like Riverview, the Hearing Officer concluded, was not required by the IDEA because it

---

**4.** A.K.'s father pointed out that the deposit was to reserve A.K.'s spot at Riverview and that the parents had not yet given any "substantive funding" to Riverview at the time of the IEP meetings. The $5,700 deposit accompanied a document entitled "Reservation and Enrollment Agreement," signed April 8, 2004, by A.K.'s parents that set out the terms and conditions of A.K.'s education at Riverview for the 2004–2005 school year. Such a deposit might have served only as a safety net intended to catch A.K. should negotiations with ACPS fall through or lead to the conclusion that Riverview was the appropriate placement. On the other hand, the deposit and enrollment agreement are also consistent with an intent to keep A.K. at Riverview no matter the outcome of the IEP proceedings.

 

"merely enhance[d] an otherwise sufficient day program."

Before reaching this conclusion, the Hearing Officer heard the testimony of educational experts presented by both parties on topics including the appropriateness of the Phillips and Kellar schools for A.K. *See A.K.,* 409 F.Supp.2d at 694–95. ACPS presented Sullivan, who had visited both schools many times. She offered testimony about both schools and how A.K. would fit in at each based on her knowledge of the schools and A.K.'s needs. ACPS also presented Cara Jill Cohen, its autism resource specialist and an expert in special education. Cohen had observed A.K. in a variety of school settings, including at Riverview, and had worked with Sullivan on A.K.'s IEP team. She was involved in the decision to recommend a private day school for A.K. and believed that his needs could be met by one. The Hearing Officer also heard the testimony of Laura Heyer, the program supervisor of the high school combination program at Phillips, who described the school and its programs in detail. She testified on the basis of her experience and A.K.'s records, which were sent to her in July 2004, that she saw nothing about A.K.'s case to suggest that Phillips could not adequately serve his needs. In opposition, A.K.'s parents presented two experts who opined that A.K. could not properly be served at a private day school like Phillips or Kellar, but neither expert had more than the shallowest of acquaintances with either school.

The Hearing Officer's findings, including the finding that the Phillips or Kellar school were sufficient to meet A.K.'s needs, are entitled to a presumption of correctness. *A.B. ex rel. D.B. v. Lawson,* 354 F.3d 315, 325 (4th Cir.2004). The evidence in the record does not rebut the presumption in this case. A.K.'s mother may not have cared for Phillips or Kellar, but the evidence indicates that the schools adequately would have attended to A.K.'s educational needs. As this Court has said before, the "IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parents." *A.B.,* 354 F.3d at 328. ACPS provided A.K. with the opportunity for a FAPE and therefore has no obligation to bear the cost of his private school education during the 2004–2005 school year. *See* 20 U.S.C. § 1412(a)(10)(C)(i).

## IV.

Despite committing a procedural error in the preparation of his IEP, ACPS provided A.K. with the opportunity for a FAPE. Consequently, he is not entitled to reimbursement of his Riverview tuition or the remand granted by the majority. I am disappointed that my colleagues today punish a school district for a harmless oversight. Had ACPS simply written the names of the candidate schools on A.K.'s IEP there would be no basis for complaint. In this case, A.K. has a legitimate complaint, but because he lost no educational opportunity as a result of ACPS's oversight, the IDEA affords him no remedy. The district court's decision should be affirmed.