**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-1485

RICHARD SHAW; CAROL SHOEMAKER; E. S., a minor, by her
parents and next friends,

Plaintiffs - Appellants,

v.

JERRY D. WEAST, Officially as Superintendent of Montgomery
County Public Schools; MONTGOMERY COUNTY BOARD OF EDUCATION,

Defendants - Appellees.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Peter J. Messitte, Senior District
Judge.  (8:06-cv-02838-PJM)

Argued:  October 29, 2009          Decided:  January 26, 2010

Before MOTZ and KING, Circuit Judges, and Anthony J. TRENGA,
United States District Judge for the Eastern District of
Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Michael Eig, MICHAEL J. EIG & ASSOCIATES, PC, Chevy
Chase, Maryland, for Appellants.  Jeffrey A. Krew, JEFFREY A.
KREW, LLC, Ellicott City, Maryland, for Appellees.  **ON BRIEF:**
Paula A. Rosenstock, MICHAEL J. EIG & ASSOCIATES, PC, Chevy
Chase, Maryland, for Appellants.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In January 2006, following the refusal of the Montgomery County Board of Education to authorize the placement of their then minor child, E.S., into a residential school based on her disabilities, appellants Richard Shaw and Carol Shoemaker (together with E.S., the "Shaws"), unilaterally enrolled E.S. in a residential treatment facility in Massachusetts. They then filed an action under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.*, against Jerry Weast, Superintendent of the Montgomery County Public Schools, and the Montgomery County Board of Education (collectively referred to as "MCPS"), seeking reimbursement for the cost of that facility, claiming that MCPS violated the IDEA by denying E.S. a free appropriate public education. The Shaws appeal the district court's order granting summary judgment in favor of MCPS. For the reasons below, we affirm.

I.

A.

Pursuant to the IDEA, a child with disabilities is entitled to a "free appropriate public education" ("FAPE") designed by the child's school district to meet his or her particular needs. 20 U.S.C. § 1400(d)(1)(A). The FAPE must be "reasonably calculated to confer some educational benefit on a disabled

2

child." MM v. Sch. Dist. of Greenville County, 303 F.3d 523, 526 (4th Cir. 2002) (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)). The FAPE must also provide the least restrictive environment that is appropriate for the child. 20 U.S.C. § 1412(a)(5)(A). The IDEA does not require a school district to provide a child with the best possible education. Rowley, 458 U.S. at 192. In other words, though a school district must offer each student a FAPE, the IDEA does not require the "furnishing of every special service necessary to maximize each handicapped child's potential." Hartmann v. Loudoun County Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997) (quoting Rowley, 458 U.S. at 199-200).

The IDEA requires that an "IEP Team," consisting of the student's parents, the student's teacher, a school district representative, and, where appropriate, the student, develop an Individualized Educational Program ("IEP") for the student, setting forth details on the implementation of the student's FAPE. 20 U.S.C. § 1414(d)(1)(B). The IEP contains statements about the child's functioning levels, goals, services to be provided, and criteria for future evaluations of the child's progress. Id. at § 1414(d)(1)(A). It is against this backdrop that the Shaws claim that the IEP that MCPS developed failed to provide E.S. with a FAPE.

B.

E.S. was born in the Philippines in 1985, and was severely malnourished as a young child.  She came to live in an orphanage there and, at the age of four, was adopted by Richard Shaw and Carol Shoemaker who brought E.S. to live in Maryland.

E.S. has struggled with severe disabilities throughout her academic life, including emotional disturbance, hearing impairment, speech and language impairment, and learning disabilities.  E.S. has also been diagnosed with bipolar disorder, clinical depression, and post traumatic stress disorder, stemming from an alleged unwanted sexual encounter.

In the middle of seventh grade, E.S. experienced increased social and emotional issues, including suicidal tendencies and clinical depression.  E.S.'s IEP Team determined that the least restrictive environment for E.S. was a full-time, non-public, special education day school.  Accordingly, at the start of her eighth grade year, E.S. began at the Foundation School ("Foundation"), a private special education day school.

During her first few years at Foundation, E.S. was able to complete over twenty credits.  During the 2003-2004 school year, however, E.S. began to struggle with a number of issues, including depression and loss, and was hospitalized for a period of time during the school year for suicidal ideations.  On April 30, 2004, E.S.'s IEP Team met to develop an IEP for the 2004-

4

2005 academic year, taking into account E.S.'s recent problems. The IEP Team identified a number of objectives for E.S. to address her audiological, emotional, academic, and other needs, and the IEP Team agreed that the least restrictive environment where E.S.'s IEP could be implemented remained at a private separate day school. Accordingly, they determined that E.S. would continue at Foundation for the 2004-2005 academic year.

E.S.'s condition deteriorated during the 2004-2005 school year. During an especially troubling incident in mid-October, E.S. became agitated and began to engage in self-mutilating acts while at school and had to be physically restrained. As a result of that incident, a functional behavior assessment ("FBA") was conducted. The FBA results showed that E.S. had become "increasingly oppositional with staff" and more disrespectful, and that she continued to engage in self-mutilation at school. JA 1099. The FBA also indicated that E.S. "had difficulty remaining physically safe in situations at school and at home." Id. On November 5, 2004, E.S.'s IEP Team met to address the issues identified in the FBA and developed a plan to address some of E.S.'s behavioral problems.[1] Notwithstanding the implementation of the plan, by December of

---

[1] The plan also addressed E.S.'s hearing issues, but E.S. did not consistently use the resources provided to her, nor did she consistently wear hearing aids or replace the batteries in her hearing aids while at Foundation.

that year, E.S.'s interim progress report showed that she was in danger of failing four classes, two of which were graduation requirements.

In April 2005, E.S. was hospitalized. She was released from the hospital on April 30, 2005, but did not return to Foundation for the remainder of the school year. After her April hospitalization, E.S.'s IEP Team met a number of times to determine the proper placement for E.S. for the 2005-2006 academic year. During one of those meetings, E.S. expressed a desire not to return to Foundation. By September 2005, E.S.'s psychiatrist, Dr. Michal Potash, recommended that E.S. be placed in a twenty-four hour care facility. E.S.'s parents also submitted a recommendation by Dr. William Stixrud, Ph.D., another psychologist, stating that E.S. might be able to benefit from placement in a residential facility.

On September 13, 2005, E.S.'s IEP Team again convened to discuss whether E.S. required placement at a residential facility or whether a private separate day school would satisfy the IDEA. The MCPS staff contended at that meeting that E.S. could continue at a private separate day school, since her issues were mainly mental-health related, improvable by medication. The IEP Team agreed at that meeting that Foundation would continue as E.S.'s interim placement. Shortly after this meeting, an MCPS School Psychologist, Marcia Gustafson, M.Ed.,

6

conducted a review of Dr. Stixrud's assessment of E.S. Based on her review, Dr. Gustafson concluded that E.S. should be placed in a therapeutic school setting for students with serious emotional issues. Dr. Gustafson also concluded, however, that a residential placement was not necessary to further E.S.'s education, though it might be necessary to address E.S.'s mental health issues.

On October 17, 2005, E.S.'s IEP Team met once again to review E.S.'s IEP and placement. The Team revised E.S.'s IEP to include a number of new accommodations and objectives. None of these goals and objectives required implementation beyond the school day and the MCPS IEP team members determined that a private separate day school was still the least restrictive environment where E.S. could receive a FAPE. During the meeting, the IEP Team also discussed the Shaws' request for a residential placement for E.S. While the MCPS team members did not agree that a residential placement was necessary, all parties agreed that there would be a change in E.S.'s school placement, to address E.S.'s request that she no longer attend Foundation. MCPS identified three alternative private separate day schools for E.S.: the Lodge School, Oakmont School, and Pathways School.

On October 19, 2005, MCPS personnel corresponded with the three potential schools regarding whether or not they could

implement E.S.'s IEP. On October 20, 2005, E.S. returned to Foundation. Approximately a week later, the Pathways School and Lodge School informed the Shaws that they could not implement E.S.'s IEP. During the first week of November, Oakmont School informed the Shaws that it could implement E.S.'s IEP.[2]

On November 4, 2005, the Shaws notified MCPS that E.S. would not attend a day school and requested that MCPS provide a residential placement. Around the same time, E.S. again began to engage in self-mutilation and tried to kill herself by walking in front of traffic. Shortly thereafter, E.S. stopped attending Foundation. E.S.'s parents requested that the IEP Team re-convene, but MCPS would not comply, citing a lack of any new information from the Shaws since the October IEP Team meeting a month earlier. In December, E.S. again tried to kill herself, this time by cutting herself, and was hospitalized for psychiatric treatment.

On December 29, 2005, at E.S.'s parents' request, Dr. Vincent Cullotta conducted a private neuropsychological consultation, and recommended, based on his consultation, that E.S. be placed in a therapeutic residential environment, which would lessen the risk for E.S. to harm herself or others and

---

[2] The Shaws learned some time in the beginning of 2006 that Oakmont School would close in March of that year.

8

also allow E.S.'s medication usage to be monitored 24 hours a day.

On January 3, 2006, E.S.'s parents enrolled E.S. at F.L. Chamberlain School ("Chamberlain"), a residential treatment facility in Massachusetts. At Chamberlain, E.S. continued to attend classes and received clinical therapy during the school day, as well as additional support outside of the school day. The additional support included waking E.S. up and getting her to class, ensuring that E.S. ate proper meals, and ensuring that E.S. maintained proper hygiene.

On March 13, 2006, exercising their right under 20 U.S.C. § 1415(f), the Shaws requested mediation and a due process hearing, seeking reimbursement for the cost of sending E.S. to Chamberlain. After an unsuccessful session on March 24, 2006, MCPS transmitted the request for a mediation and hearing to the Office of Administrative Hearings. On May 18, 2006, Administrative Law Judge Jerome Woods, II (the "ALJ"), presided over a hearing between the parties in Rockville, Maryland. The hearing took place over five days, ending on June 20, 2006.

On July 18, 2006, the ALJ concluded that the Shaws failed to establish that E.S.'s placement at Foundation did not provide a FAPE in the least restrictive environment and that they failed to establish that E.S. did not receive educational benefits during her placement at Foundation. The Shaws filed this

lawsuit, appealing the ALJ's decision.[3] On March 31, 2008, the district court granted summary judgment for MCPS.

## II.

## A.

This Court's standard of review in an IDEA case such as this varies somewhat from the *de novo* review generally applicable to an award of summary judgment. The standard of review in an IDEA case is a "modified" *de novo* review, where "due weight" is given to the underlying administrative proceedings. MM, 303 F.3d at 530-531; Doyle v. Arlington County Sch. Bd., 953 F.2d 100, 103 (4th Cir. 1991). In connection with that review, the findings of fact from the administrative hearing are considered to be *prima facie* correct; and if the reviewing court does not adhere to those findings of fact, "it is obliged to explain why." MM, 303 F.3d at 531. Nevertheless, the reviewing court should not substitute its own knowledge about education policy for the school district's. Id. Accordingly, in our review, we examine the entire record, affording "due weight" to the administrative findings.

---

[3] A party aggrieved by the decision and findings of a due process hearing may bring a civil action in federal court. 20 U.S.C. § 1415(i)(2).

10

B.

This case presents two issues on appeal: (1) whether E.S.'s IEP was legally deficient on its face because of its apparent failure to name a specific permanent placement for E.S. and (2) whether the ALJ and district court properly concluded that a private day school provided E.S. with a FAPE and that E.S. did not require a residential placement under the IDEA.

1.

The Shaws argue that the IEP developed in October 2005 was deficient as a matter of law because it failed to name a specific placement for E.S. This argument fails. The IEP unambiguously states that Foundation would serve as E.S.'s interim placement while the Shaws explored the three other day schools proposed by MCPS. MCPS provided these additional private day placement options, not because Foundation could not implement E.S.'s IEP, but as an attempt to accommodate E.S.'s request to change schools. At no time during the 2005-2006 academic year was E.S. without an assigned school, such that the Shaws were required to "fend for themselves." Foundation, the school indicated in the IEP, provided all the necessary services listed in E.S.'s IEP.

For all of these reasons, this case present a situation far different than that addressed in A.K. v. Alexandria City Sch. Bd., 484 F.3d 672 (4th Cir. 2007). In A.K., the student, who

11

suffered from a nonverbal learning disability, as well as Aspergers Syndrome and obsessive compulsive disorder, was attending a residential program, pursuant to a settlement between the student's parents and the school system. Id. at 675-676. At the close of the school year, at an IEP team meeting about the following academic year, the school system declared that the student should be removed from his residential placement and placed in a private day school for the upcoming school year. Id. at 676. No specific school was listed on the IEP or discussed in detail at the meeting. During the summer, the school system sent out applications to five private day schools on behalf of the student. Two of the schools indicated that they could not implement the student's IEP. A third school did not have room for the student. Id. The parents toured and researched the remaining two schools and concluded that neither could adequately provide the student with a FAPE. Id. at 677.

We concluded in that case that the student's IEP failed to identify a particular school and was therefore not reasonably calculated to enable the student to receive educational benefits. While the parents agreed that an appropriate private day school could have provided their child with a FAPE, the IEP failed to present such a placement. "[T]he IEP development process concluded without any significant discussion of whether such a school existed, or if it did, how it would be a

12

satisfactory match for A.K." Id. at 681. Because of this, "the parents were left to fend for themselves to determine whether any private day school in their area . . . would be a satisfactory fit." Id.

Here, MCPS made a referral to three therapeutic day school programs and while these alternatives were being explored, as the IEP clearly states, E.S. would continue at Foundation, a school that MCPS believed could implement E.S.'s IEP, that was clearly listed in the IEP, and that had been E.S.'s school for years and the subject of multiple IEP Team meetings. Accordingly, E.S.'s parents were never left to "fend for themselves," as the parents in A.K. were, and the IEP's designation of "Foundation" as E.S.'s placement, even though it was listed as "interim," was sufficient to satisfy the IDEA under the facts of this case.

2.

We next turn to the merits of the Shaws' argument that placement at a private day school could not have provided E.S. with a FAPE and that a residential placement was necessary for E.S. MCPS argues that Foundation provided E.S. with a FAPE and that a residential school was required only to address E.S.'s mental and emotional health issues. Based on the record before us, we agree with MCPS.

13

The state may be required in certain cases to fund residential placements. "If the educational benefits which can be provided through residential care are essential for the child to make *any* educational progress at all, then residential care is required under the EHA [the precursor to the IDEA]." Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 980 (4th Cir. 1990) (emphasis in original). However, the IDEA "does not authorize residential care merely to enhance an *otherwise sufficient* day program." Id. (quoting Abrahamson v. Hershman, 701 F.2d 223, 227 (1st Cir. 1983) (emphasis in original)). "If residential placement is necessitated by medical, social, or emotional problems that are segregable from the learning process, then the local education agency need not fund the residential placement." Id. at 980. See also Clovis Unified Sch. Dist. v. California Office of Admin. Hearings, 903 F.2d 635 (9th Cir. 1990) (finding student's hospitalization was primarily for medical and psychiatric reasons and the state was therefore not required to fund it).

Kruelle v. New Castle County Sch. Dist., 642 F.2d 687 (3d Cir. 1981) presents appropriate circumstances under which a residential placement may be necessary. Burke County Bd. of Educ., 895 F.2d at 980 (adopting the standard articulated in Kruelle). In Kruelle, a mentally retarded child who was unable to speak and not toilet trained was found to need extensive

14

around the clock care as part of his FAPE. "[T]he concept of education is necessarily broad with respect to persons such as Paul. 'Where basic self-help and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point.'" Id. at 693 (quoting Battle v. Commonwealth of Pennsylvania, 629 F.2d 269, 275 (3d Cir. 1980)). See also Abrahamson, 701 F.2d at 228 (holding that only residential treatment could provide a FAPE where the student could not eat, dress, go to the bathroom, or care for himself in any way).

While Kruelle presents a compelling set of circumstances, and residential placement may be required where a student's medical needs and educational needs are less clearly unitary, this case presents facts near the other end of the spectrum. The Shaws' decision to place E.S. in a residential treatment facility was based on their desire to ensure E.S. did not hurt herself, that she took her medicine, and that she was in a safe environment. The ALJ found based on all of the evidence that E.S.'s parents' "demand for residential placement in this case, is primarily to address the safety needs of the Student as a result of her mental health issues and not her educational needs." JA 1396. Based on an independent review of the record, we agree that the treatment of E.S.'s mental health and safety issues was distinct and segregable from her educational needs.

15

We also find that Foundation provided E.S. with a FAPE. E.S. earned over twenty credits during her time there and, as of December 2004, was passing Art, Physical Education, and Consumer Math. Further, Foundation offered E.S. resources to address her audiological issues, although E.S. did not always elect to use those resources. While E.S.'s educational progress was slowed during her psychiatric episodes, the record is clear that during periods when E.S.'s mental health issues were stabilized, her education progressed.

Though E.S.'s story is tragic, we must conclude that she possesses the basic self-help and social skills that the student in <u>Kruelle</u> lacked and sufficient abilities to proceed in her studies in the less restrictive environment of a private day school such as Foundation. It is undisputed that E.S. did not want to continue at Foundation and that MCPS hoped to comply with her wish to attend another school, but the record also supports the ALJ and district court's conclusion that Foundation continued to offer the services and resources necessary to implement E.S.'s IEP and that E.S. received some educational benefit there. That E.S.'s emotional and mental needs required a certain level of care beyond that provided at Foundation does not necessitate a finding that the state should fund that extra care when it can adequately address her educational needs separately.

16

III.

Because the IDEA requires the provision of "the least restrictive environment" where a student can access a free appropriate public education, and because the Court finds that Foundation offered such an environment, the Court affirms the district court's grant of summary judgment for MCPS.

AFFIRMED